**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

JIANQING WU,                                    *

        Plaintiff,                        *

        v.                                        *          Civil Action No. AW-03-1290

TRANS UNION, *et al.*,                           *

        Defendants.                      *
                             * * * * *

## MEMORANDUM OPINION

In this day and age, most adults in America have attempted to procure consumer credit at some point.  Banks, department stores, employers, insurance firms, and other organizations routinely rely on credit reports to determine whether or not to extend credit to a customer.   To ensure the accuracy and fairness of credit reporting and to protect consumer information, Congress enacted the Fair Credit Reporting Act in 1970, which mandates that consumer reporting agencies ("CRAs") employ reasonable procedures to maintain consumers' credit files.  Plaintiff initially brought this suit against six banks and the three major credit report agencies, alleging violations of the Fair Credit Reporting Act ("FCRA") and the commission of various common law torts. The claims against eight defendants have been dismissed, and the only remaining defendant is Equifax ("Equifax" or "Defendant"), a CRA.  Currently pending before this Court are Defendant's Motion for Summary Judgment [153] and Plaintiff's Cross-Motion for Summary Judgment [156].  The Court has reviewed the entire record, as well as the Pleadings with respect to the pending motions.  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2004).  For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early part of 2001, Plaintiff filed a dispute with Equifax about his credit file.  In this dispute, Plaintiff requested that Equifax reinvestigate five entries in his credit report.  These entries indicated that Plaintiff made two payments 30-days late on an account held with Fleet, two payments 30-days late on an account held by First USA, and one payment 30-days late on an account held by Discover.  In addition, Plaintiff "disputed" two late entries that had yet to appear in his credit file, which he anticipated that Universal Bank would report at a later time.

Plaintiff concedes that he made late payments and partial payments on these accounts, but asserts that he had entered into agreements with these banks to repay small portions of his balances each month.

After receiving this dispute, Equifax initiated a reinvestigation.  To reinvestigate the disputed trade lines, an Equifax agent created a maintenance sheet summary on April 27, 2001. It is Equifax's policy to accept consumer credit information from sources that Equifax has determined are reasonably reliable based on either prior experience or the source's reputation.  These banks, creditors or merchants must execute a contract with Equifax that they will supply only accurate and updated information.  Equifax has averred that it considers Fleet, First USA, Discover, and Universal Bank such reliable sources.

Equifax notified Fleet, First USA, Discover, and Universal Bank of Plaintiff's dispute by sending each bank a form, referred to as a Customer Dispute Verification ("CDV").  Fleet, First USA, and Universal Bank all responded to the CDVs and verified that the information on Plaintiff's credit report was correct.

Discover, however, did not answer Equifax's request for verification within the 30-day

period prescribed by the FCRA. *See* 15 U.S.C. § 1681i(a). Consequently, Equifax updated

Plaintiff's credit report to reflect that Plaintiff had paid the account in full on May 18, 2001. On

May 25, 2001, Equifax then sent Plaintiff a corrected version of his credit report and notified him

of the completion of its reinvestigation.

Unsatisfied with the results of the reinvestigation, Plaintiff sent Equifax a letter on June 3,

2001, which requested that Equifax send him their procedures for reinvestigation, disputed the Fleet

and Universal Bank entries, objected to a new 30-day late payment entry under his University of

Maryland account, and demanded that an attorney review his dispute. Placing his own gloss on the

Fair Credit Reporting Act, Plaintiff warned Defendant, "Unless you have strong evidence in writing

to support your finding, I will hold you responsible for all future damages. You should not act as

a rubble [*sic*] stamp, and you must make your own judgment to determine the true reason I withhold

the payments. The lack of independence of judgment on your part has turned your service into an

evil weapon that creditors can use against debtors in dispute. This clearly violates every letter and

spirit of the Fair Credit Reporting Act." Pl. Ex. at 219.

In response to Plaintiff's June 2001 correspondence, Equifax sent a letter to Plaintiff, which

explained that "Equifax contacted each source directly and our investigation is now complete." Pl.

Ex. at 222.

Deeming this response unsatisfactory, Plaintiff sent a second letter to Equifax on July 29,

2001. This letter again questioned Defendant's reinvestigation procedures, requested attorney

review, and contested the validity of the University of Maryland entry. In addition, Plaintiff asked

Equifax to reinvestigate a collection account from Dorsey Forge. In accordance with its

reinvestigation procedures, Equifax contacted Dorsey Forge and asked it to verify the account.

3

Dorsey Forge did not respond to Equifax's request in a timely manner.  As a result, Equifax deleted the collection account from Plaintiff's credit file.

Apparently dismayed with Equifax's reactions to his numerous letters, Plaintiff filed this suit on May 1, 2003.  The Second Amended Complaint contains thirteen counts, only four of which pertain to Equifax.  The counts against Equifax can be summarized as follows: (1) Count I for biased credit reporting in violation of the FCRA; (2) Count II for maintenance of flawed credit histories in violation of the FCRA and Maryland's public nuisance law; (3) Count III for purposeful maintenance of flawed credit files in violation of the FCRA; and (4) Count IV for civil conspiracy to injure Plaintiff under both the FCRA and Maryland law.

Defendant filed a Motion for Summary Judgment on December 8, 2005.  On December 27, 2005, Plaintiff responded to this motion and filed a Cross-Motion for Partial Summary Judgment on the FCRA claims.  These motions are ripe for review, and the Court will now issue an Opinion.

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  In a motion for summary judgment, the moving party discharges its burden by showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325.  The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted).  To defeat a motion for summary judgment, the non-moving party must come forward and show that a genuine issue of material fact exists. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  While the evidence of the non-movant is to be believed and all justifiable inferences drawn

in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation

or compilation of inferences.  *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998);

*Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## ANALYSIS

Realizing the importance of maintaining accurate consumer credit files, Congress passed

the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the

needs of commerce for consumer credit, personnel, insurance, and other information in a manner

which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy,

and proper utilization of such information."  15 U.S.C. § 1681(b); *see also* Michael Epshteyn, Note,

*The Fair and Accurate Credit Transactions Act of 2003: Will Preemption of State Credit Reporting*

*Laws Harm Consumers?*,  93 Geo. L.J. 1143, 1145 (2005) (Congress intended for the FCRA "to

facilitate commerce . . . through the use of nationwide standards and accurate information . . . and

to protect consumers and maintain their confidence in the credit reporting system.").  To carry out

this purpose, the FCRA includes several enforceable provisions that impose  liability if CRAs do

not follow reasonable procedures to ensure the accuracy of a consumer's credit report.  *See* 15

U.S.C. § 1681e(b).  The FCRA also permits consumers to challenge information in their credit

reports that they believe is inaccurate or incomplete.  *See* 15 U.S.C. § 1681i.  Additionally, damages

are authorized for both negligent and willful failure to comply "with any requirement imposed" by

the Act. 15 U.S.C. § 1681o[1]; 15 U.S.C. § 1681n.[2]

---

[1] Section 1681o makes any person who negligently fails to comply "with any
requirement imposed under this subchapter with respect to any consumer. . . liable to that
consumer in an amount equal to the sum of . . . (1) any actual damages sustained by the

I.        **Plaintiff's Allegations Under 15 U.S.C. § 1681e(b)**

Plaintiff alleges that Equifax violated § 1681e(b) of the FCRA by failing to follow reasonable procedures to assure "maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

Interpreting § 1681e(b), courts have held that a plaintiff cannot establish a prima facie violation of this part of the FCRA, absent a showing that: (1) the consumer report contains inaccurate information and (2) the CRA did not use reasonable procedures to ensure the accuracy of the information.  *See, e.g.*, *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) ("a consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy."); *Grant v. TRW, Inc.*, 789 F. Supp. 690, 692 (D. Md. 1992) (noting that to make out a prima facie violation of § 1681e(b), a plaintiff must present evidence tending to show that a CRA prepared a report that contained inaccurate information); *see also Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638, 640-41 (W.D. Va. 2000) (setting forth the elements for a claim under § 1681e(b) as "(1) failure by the reporting agency to follow reasonable procedures to assure the accuracy of its reports; (2) a report which is, in fact, inaccurate; (3) damages to the plaintiff; and (4) proximate cause").

As a showing of "accuracy" serves as a defense to a suit under § 1681e(b), much of the

---

consumer as a result of the failure." 15 U.S.C. § 1681o(a)(1).  In some cases of negligent non-compliance with the FCRA, the plaintiff may also recover costs and attorney's fees.  *See* 15 U.S.C. § 1681o(a)(2).

[2] Section 1681n makes a person who willfully violates the FCRA's provisions liable for actual damages, punitive damages, and the consumer's attorney's fees and costs.  15 U.S.C. § 1681n(a).

relevant jurisprudence has focused on what constitutes accuracy under the FCRA.  *See, e.g*, *Dalton*, 257 F.3d at 415 (describing standard for accuracy); *Grant*, 789 F. Supp. at 692 (same); *see also Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir. 1998); *Alexander v. Moore & Assoc., Inc.*, 553 F. Supp. 948, 951-52 (D. Haw. 1982).  In light of the overarching purpose of the FCRA, courts have not read this term narrowly, and even a consumer report that contains technically complete information may be deemed "inaccurate" if the statement is presented in such a way that it creates a misleading impression.  *Dalton*, 257 F.3d at 415 ("A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse [ ]' effect") (quoting *Sepulvado*, 158 F.3d at 895); *Grant*, 789 F. Supp. at 692 ("There may be extreme instances in which a technically accurate statement is so inherently misleading that it would run afoul of the 'maximum possible accuracy' requirement of § 1681e(b)").

Thus, the viability of Plaintiff's claim under § 1681e(b) turns on whether Plaintiff can make a showing that the late payments on 2001 his credit reports were "accurate."  Plaintiff's arguments regarding the "accuracy" of the report are a bit difficult to discern.  Plaintiff's cross-motion for summary judgment dedicates most of its discussion of the § 1681e(b) claim to the issue of "reasonableness" despite the fact that a demonstration of accuracy would dispose of plaintiff's § 1681e(b) claim.

Even viewing the facts in the light most favorable to Plaintiff, this Court remains unconvinced that any of the reports were "inaccurate" within the meaning of the FCRA.  In Plaintiff's letter sent on April 23, 2001, Plaintiff admits that the due date on his First USA account was the 12th, 13th, and 14th of each month, but that he made payments on the June 8, 2000, *July 24, 2000*, August 7, 2000, August 19, 2000, September 7, 2000, September 27, 2000, October 7, 2000,

*November 20, 2000*, and December 8, 2000.  Pl. Ex. at 146.  In this letter, Plaintiff also states that

he did not pay under the original terms of his cardholder agreement and that he made only *partial*

payments in some months.  In an effort to justify these late payments, Plaintiff explains that he had

enrolled in the bank's "Assist Program" on October 2, 2000, which he believed excused him from

paying the full amount due.  Pl. Ex. at 147.  Whether or not First USA considered entrance into the

Assist Program an agreement not to report Plaintiff's late payments, Plaintiff cannot escape the  fact

that he paid his account late on more than one occasion and did not pay the "original" amount due.[3]

 Because it remains undisputed that Plaintiff actually made these payments late, the First USA

entries on the Equifax reports were not "inaccurate" within the meaning of § 1681e(b).

Plaintiff's objections to the late payment notation on his Fleet card must fail for the same

reason.  Plaintiff has produced evidence that he received statements from Fleet in August and

September, indicating that the minimum amount due on the account was $348.00 for each month.

*See* Pl. Ex. at 170-71.  For these months, Plaintiff only paid $128.  In addition, Plaintiff's July

statement also shows that Plaintiff only made a partial payment for the prior month.  Pl. Ex. at 169.

Although Plaintiff states that he entered into Fleet's "Hardship Program" on August 16, 2000,[4] the

evidence clearly shows that Plaintiff made late payments and these payments covered only a portion

---

[3] Plaintiff also alleges that the First USA credit limit was incorrect on his credit report. Plaintiff's Cross Motion for Summary Judgment states that "*First USA* attempted to reduce the high credit limit . . . ."  Pl.'s Mtn. at 45.  Again, it seems apparent that Plaintiff's dispute concerns the actions of First USA, his creditor, not the accuracy of the credit report maintained by Equifax.

[4] In addition, it must be noted that the August 17, 2000 letter to Plaintiff from Fleet does not explicitly represent that Fleet would not report any payments as late.  Indeed, Fleet's letter to Plaintiff on August 3, 2000 indicates that Fleet did "not have a repayment program that w[ould] accommodate [Plaintiff's] request."  Pl. Ex. at 169-70.

of his total balance due.  Plaintiff also claims that the report of his credit limit as $9,300 was

erroneous.  Plaintiff's *own* exhibit belies this contention, and the statements attached to Plaintiff's

cross-motion for summary judgment indicate that Fleet had reduced Plaintiff's credit limit from

$12,800 to $9,300.  *See*  Pl. Ex. at 171-73.  Finally, this Court notes that out of over 400 pages of

exhibits, Plaintiff has not included a document to support his assertion that Fleet erred when it

reported his credit limit as $8,700 in June of 2001.

Likewise, Plaintiff cannot recover under § 1681e(b) for the late entries for his Universal

Bank account.  In his cross-motion for summary judgment, Plaintiff avers that because of a dispute

over the interest rate on convenience checks for his Universal Bank account, "Plaintiff suspended

payment starting for the September 28, 2000 billing statement."  Pl.'s Mtn. at 49.  As noted above,

Plaintiff's admission that he did not pay his account prevents a finding that these trade lines in the

Equifax report were "inaccurate."[5]

This Court reaches the same conclusion concerning Plaintiff's late payments on his

University of Maryland account.  According to Plaintiff, the payment for this account was due on

the first of the month, each month.  Yet, by his own admission he mailed a check "for both [the]

October 31, 2000 and the November 3[0,] 2000[6] billing statements by one single check # 272 in the

amount of $80 in  [*sic.*] the morning of December 27, 2000."   Pl.'s Mtn. at 47; *see also* Pl. Ex. at

128-29.   University of Maryland did not record this payment as received until January 2, 2001.

Because the delivery and processing of past payments took as little as "two days," Plaintiff posits

---

[5]  The Court need not review the accuracy of the Discover account at this point as it was
removed from Plaintiff's credit report shortly after he filed his dispute.

[6]  Plaintiff cites November 31, 2000 as the due date, but it appears that Plaintiff meant
November 30, 200 as the month of November has only 30 days.

that "the University of Maryland wrongfully used [the] processing or posting date of the check to count the days of lateness. As a result of its failure to process the check in time in the New Year Eve, the payment became exactly '30 days past due.'"  Pl.'s Mtn. at 47.  This statement, however, is little more than conjecture.  That the delivery of a Plaintiff's payment took slightly longer than usual seems wholly unremarkable.  The United States Postal Service does not guarantee delivery of first class mail by a specific date, and the Postal Service may take additional time to deliver first class mail at certain times of the year.  Simply asserting that the payment arrived later than he expected does not persuade this Court that the University of Maryland 30-day late entry was inaccurate.  Rather, the record shows that Plaintiff sent the October payment at the last minute and now seeks to shift the blame to the recipient of the payment, University of Maryland, because it took 5 days to receive and process his check.

In making this argument, Plaintiff has not shown that the Postal Service "lost" his payment, but nevertheless urges this Court to rule that the University of Maryland acted wrongfully, relying on *Phillips Roofing Co. v. Maryland Broadcasting Co.*, 40 A.2d 298  (Md. 1944).  In *Phillips*, the plaintiff had entered into a contract with the defendant that entitled the plaintiff to use the defendant's broadcasting facilities at certain times.  *Id.* at 299.  Pursuant to this contract, plaintiff mailed to the defendant a check, which the defendant never received.  Reversing the trial court's dismissal of the plaintiff's suit, the Maryland Court of Appeals held that the plaintiff's attempt to make a prompt payment prevented the defendant from cancelling the plaintiff's contract.  *Id.* at 301. *Phillips*, however, is distinguishable from the case at bar.  In *Phillips*, the Court held that the defendant could not *cancel* or forfeit the plaintiff's contract when the plaintiff had mailed the payment in ample time to reach the defendant by the date the payment was due.  *Id.*  This case makes

10

no mention of whether the defendant had the right to assess late fees or consider the payment late. The decision only concerns the cancellation of the entire contract.  Furthermore, in this case, Plaintiff did not merely send the payment a few days before the payment due date, but rather at the eleventh-hour, just days before the payment would become 30-days late.  Since the evidence proffered by Plaintiff demonstrates that Plaintiff paid this account late and did not allow sufficient time for the delivery of his payment, Plaintiff cannot show that the University of Maryland account was reported or recorded inaccurately.

In addition, the remainder of Plaintiff's challenges to his report appear to be nothing more than an attempt to collaterally attack the basis of accurately reported information.  As codified, the FCRA, however, does not create a cause of action against CRAs for challenging accurate information.  *See, e.g.*, *Dalton*, 257 F.3d at 415; *Wadley v. Equifax Information Servs., LLC*, 396 F. Supp. 2d 677, 679-80 (E.D. Va. 2005).

Even assuming, *arguendo*, that Equifax's consumer report for Plaintiff had inaccuracies, Plaintiff has still failed to demonstrate a genuine issue of material fact exists with respect to his § 1681e(b) claim.  Construing § 1681e(b), the Fourth Circuit precedent makes clear that a plaintiff bears the burden of showing that a CRA, such as Equifax, did not follow reasonable procedures. *See Dalton*, 257 F.3d at 416.

While the "reasonableness" of a CRA's procedures is ordinarily a question of fact, the implementing regulations for the FCRA clarify that a CRA follows reasonable procedures if it relies on information from a reputable source unless it has some notice of systemic problems with the accuracy of its reports.  *See* Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600 app. By carving out a defense for liability under § 1681e(b) for a CRA that follows "reasonable

procedures," Congress manifested its intent not to make CRA's strictly liable for any inaccuracy on

a consumer credit report.   The Commentary on the Fair Credit Reporting Act, written by the Federal

Trade Commission, explains that:

> [w]hether a consumer reporting agency may rely on the accuracy of
> information from a source depends on the circumstances. This section
> does not hold a consumer reporting agency responsible where an item
> of information that it receives from a source that it reasonably
> believes to be reputable appears credible on its face, and is
> transcribed, stored and communicated as provided by that source.
> Requirements are more stringent where the information furnished
> appears implausible or inconsistent, or where procedures for
> furnishing it seem likely to result in inaccuracies, or where the
> consumer reporting agency has had numerous problems regarding
> information from a particular source.

Commentary on the Fair Credit Reporting Act, 16 C.F.R. pt. 600 app.

Equifax has provided detailed statements about its procedures.   Equifax maintains a

computerized database with credit information originated by approximately 40,000 sources. This

database contains approximately 200 million names and addresses and more than a billion trade

lines.  Equifax's Director of Customer Care, in her affidavit, explains that the company processes

over 50 million updates to trade information each day.   Creditors send updated information on

millions of accounts to Equifax daily by computer tapes, and each update includes identifying

information, such as the consumer's address, social security number, and date of birth.  Equifax uses

this identifying information to link the credit items to the appropriate consumer.

As one court has observed, the "reasonable procedures" provision of the FCRA strikes a

balance between the rights of citizens to have their credit information recorded accurately and the

need for efficiency among consumer reporting agencies.  *See Auto Mashers*, 85 F. Supp. 2d at 641.

Therefore, "[a]bsent some prior indication that the information is inaccurate, it is reasonable and cost

efficient to report information without independent verification." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994).

Although the system which Equifax has adopted may result in some inaccuracies, this risk alone does not render Equifax's procedures unreasonable.  Plaintiff argues that Equifax has not shown that its process for investigating the companies that furnish credit information and site visits to these businesses will ensure accuracy and reliability.  Seemingly, Plaintiff holds the opinion that nothing short of an in-person review of each derogatory item reported would satisfy the requirements of § 1681e(b) of the FCRA.  Not surprisingly, Plaintiff has not provided any caselaw to support this proposition.  To make Equifax liable under the FCRA for relying on the records of businesses, which Equifax has identified as trustworthy, would vitiate one of the purposes of the FCRA, to facilitate commerce.  Under the system Plaintiff proposes, the economic costs of investigation would render it economically infeasible for CRAs to function.  Nothing in the FCRA or its implementing regulations evinces the intent to place such heavy burdens on CRAs.   For this reason, the Seventh Circuit has ruled that procedures, such as those employed by Equifax here, meet the requirements of § 1681e(b) as a matter of law in *Sarver v. Experian Information Solutions*, 390 F.3d 969, 972 (7th Cir. 2004); *see also Sepulvado*, 158 F.3d at 896 (ruling that the existence of an alleged misleading entry on the plaintiffs' credit reports did not lead to the ineluctable conclusion that the CRA failed to follow reasonable procedures).  The determination that the procedures described by Equifax comply with § 1681e(b) not only finds support in the relevant caselaw, but also makes sense from a policy standpoint as well.  Therefore, this Court holds that Equifax has implemented reasonable procedures for collecting and reporting consumer data.

II.     **Equifax's Reinvestigation of Disputed Entries on Plaintiff's Credit Report under 15**

13

**U.S.C. § 1681i**

A. <u>Equifax's Reinvestigation</u>

In addition to violations of § 1681e(b), Plaintiff alleges that Equifax did not fulfill its obligation to conduct an reasonable reinvestigation under 15 U.S.C. § 1681i.  The inquiry into the reasonableness of a CRA's reinvestigation procedures under 15 U.S.C. § 1681i differs from that required by 15 U.S.C. § 1681e(b). While a CRA may rely on information from a reputable source initially to compile a consumer's credit file under § 1681e(b), 15 U.S.C. § 1681i sets forth more detailed procedures for "reinvestigating" an entry on a credit report once a CRA is put on notice that the information may be incomplete or inaccurate.  Thus, 15 U.S.C. § 1681i provides that:

> if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a *reasonable reinvestigation* to determine whether the disputed information is inaccurate and record the current status of the disputed information. . . . If, after any reinvestigation . . ., an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall . . . promptly delete that item of information from the file of the consumer.

15 U.S.C. § 1681i(a) (emphasis added).

In evaluating whether a CRA's reinvestigation complies with this provision of the FCRA, again, the touchstone is reasonableness.  The FCRA, however, does not explicitly define what constitutes a reasonable reinvestigation.  With respect to an analogous provision of the FCRA, 15 U.S.C.  § 1681s-2(b)(1), the Fourth Circuit has opined that to determine reasonableness, "the cost of verifying the accuracy of the information" should be weighed against "the possible harm of reporting inaccurate information." *See Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 432

(4th Cir. 2004).

Although judging the reasonableness of a CRA's reinvestigation is normally within the province of the fact-finder, summary judgment may be appropriate where a plaintiff has failed to adduce evidence that would tend to prove that CRA's reinvestigation was unreasonable. *Cf. Spitzer v. Trans Union, LLC*, 140 F. Supp. 2d 562, 566 (E.D.N.C. 2000) (holding that a CRA did not violate 15 U.S.C. § 1681i as matter of law) *but see Cushman v. Trans Union Corp.*, 115 F.3d 220, 226-27 (3d Cir. 1997) ("Whatever considerations exist, it is for the 'trier' of fact [to] weigh th[ese] factors in deciding whether [the defendant] violated the provisions of section 1681i") (quoting *Henson*, 29 F.3d at 287). Here, Equifax verified each disputed item by sending CDV forms to each creditor and then updating Plaintiff's credit file based on the responses to the CDV requests. Plaintiff argues that Equifax did not consider all relevant information because it did not delete all the items he disputed. After reviewing the record, this Court cannot agree. In this case, the crux of Plaintiff's disputes is that his creditors reported his accounts as late even though he had reached settlements that changed the terms of his original agreements with these companies. The only way for Equifax to verify Plaintiff's claims was for Equifax to contact these creditors directly. While the CDVs did not include all of Plaintiff's arguments to justify his late payments, these forms contained enough information for the creditors to investigate Plaintiff's disputes.[7] Based on this information and Plaintiff's original letters, Equifax removed the Discover account and decided not to delete the

---

[7] Plaintiff also claims that Equifax should have sent Plaintiff's billing statements back to his creditors as part of the reinvestigation. This Court finds that this argument lacks merit. The creditors already maintained records with Plaintiff's billing statements. Plaintiff asserts that his creditors only considered the CDV when they verified the information on his credit report, but has not included any documentation to support this allegation. Without any evidence, this Court need not accept Plaintiff's bald assertions.

remaining accounts.  Because of the nature of Plaintiff's disputes with his creditors, Defendant's reliance upon Plaintiff's creditors' investigations of Plaintiff's accounts in this case was reasonable.

In an attempt to avoid summary judgment, Plaintiff also claims that Equifax did not conduct a reasonable investigation because it "did not make its own determination . . . on the basis of the correspondences and documents that Plaintiff had provided."  Plaintiff assumes that Equifax failed to make its "own determination" because Equifax did not resolve Plaintiff's disputes in his favor. Yet, the FCRA does not require CRAs to mediate all disputes between creditors and their clients. As previously discussed, Plaintiff's credit report was essentially accurate.  Where, as here, the Defendant considered Plaintiff's dispute and collected information from Plaintiff's creditors, this Court finds that a CRA has discharged its duty to perform a reasonable reinvestigation.

Furthermore, Plaintiff has not presented a cognizable claim under 15 U.S.C. § 1681i based on Equifax's purported failure to reinvestigate Plaintiff's University of Maryland account.  Plaintiff has conceded that he did not "specifically ask Equifax to reinvestigate" Plaintiff's University of Maryland Account.  Pl.'s Mtn. at 33.  This admission proves fatal to Plaintiff's claims under § 1681i for this alleged omission.

B.  Equifax's Alleged Failure to Provide Notice, pursuant to 15 U.S.C. § 1681i(a)(6)(B)

Not only does Plaintiff challenge the thoroughness of Equifax's reinvestigation of certain items in his credit report, but Plaintiff also contends that Equifax's letter that described the results of the reinvestigation was deficient under 15 U.S.C. § 1681i(a)(6)(B).  This provision of the FCRA provides that:

> [A] consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation . . .
> a consumer reporting agency shall provide to a consumer in writing

16

. . .

(i) a statement that the reinvestigation is completed;

(ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

(iii) a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

(iv) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

(v) a notice that the consumer has the right to request under subsection (d) of this section that the consumer reporting agency furnish notifications under that subsection.

15 U.S.C. § 1681i(a)(6).

Plaintiff asserts that the letter from Equifax did not contain: (1) a notice that Plaintiff had the right to request information about the procedures to determine the accuracy of information provided by creditors, (2) a notice that Plaintiff had the right to add a statement to his consumer file, and (3) a notice that he had the right to request that Equifax send a copy of the updated report to companies that had recently requested his credit file.

From the record currently before this Court, it appears that Equifax did not make the required disclosures. For civil liability to attach under the FCRA, however, Plaintiff must offer additional proof. To succeed in an action for negligent failure to comply with the FCRA, a consumer must make a showing of actual damages. *See* 15 U.S.C. § 1681o. Plaintiff has stated that "[b]ecause Equifax did not provide the required and specific instructions at the critical moment, Plaintiff was not advised of the ability to exercise all of his rights," Pl.'s Mtn. at 30, but the evidence presented by Plaintiff contradicts this assertion. Plaintiff's brief includes as an exhibit a letter, dated June 3,

2001, in which Plaintiff requested a detailed description of Equifax's reinvestigation. Pl. Ex. at 219. Plaintiff's brief also states that Plaintiff expressed "a desire to put a statement in his credit file in the first dispute letter." Pl.'s Mtn. at 31.  Moreover, Plaintiff's brief expressly states that Plaintiff asked Equifax in his April 23, 2001 letter "to notify all creditors that have made an inquiry to my report since October 2000" of any deletions on his credit report.  Taken as a whole, this correspondence reflects that Plaintiff was informed of his rights under the FCRA.  Indeed, in Plaintiff's June 3, 2001 letter, Plaintiff references to the FCRA by name and accuses Equifax of "violat[ing] every letter and spirit of the Fair Credit Reporting Act."  In light of this evidence, this Court finds that to the extent that Equifax did not provide Plaintiff with the information required by 15 U.S.C. § 1681i(a)(6)(B), this omission was harmless.[8]

C.   Equifax's Purported Failure to Implement Reasonable Procedures to Prevent the Reappearance of Deleted Items, under 15 U.S.C. § 1681i(a)(5)(C)

Plaintiff also argues that Equifax violated yet another part of the FCRA's reinvestigation provision by allegedly failing to prevent the reappearance of several deleted items on his credit report.  Section 1681i(a)(5)(C) states that:

> A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph [detailing the procedures for reinvestigation] . . . .

15 U.S.C. § 1681i(a)(5)(c).  Plaintiff cites two facts to bolster his claim that Equifax violated this provision of the FCRA.  First, Plaintiff states that his Equifax credit report had a misleading high credit limit for his Fleet account.  Second, Plaintiff asserts that the report had the wrong high credit

---

[8]  This Court discusses the issue of liability for willful non-compliance with 15 U.S.C. § 1681i(a)(7) in Section II.H, *infra.*

limit for his First USA account.

This Court has previously discussed the high credit limit on Plaintiff's Fleet account and will not revisit this issue in depth.  As before, this Court concludes that because Plaintiff has not provided evidence, such as an affidavit or documents from that account, that the actual credit limit on his Fleet account was not $8,700 in June  2001, he has not met his burden of proving a violation of 15 U.S.C. § 1681i(a)(5)(c) for this account.

With respect to the First USA account, Plaintiff's own words expose the weakness in his claim.  Plaintiff has stated that "First USA reported a reduced credit limit as a 'high credit limit'" in his Equifax credit report.  Pl.'s Mtn. at 36.  Even Plaintiff admits that First USA, *not Equifax*, supplied the information on his high credit limit.  In addition, the record is devoid of evidence that the credit limit on Plaintiff's First USA account was ever deleted pursuant to a reinvestigation or that the insertion of the lower credit limit was erroneous.

As Plaintiff has not presented evidence of the reinsertion of a "previously deleted" item, he has not made a prima facie showing of a violation of 15 U.S.C. § 1681i(a)(5)(c).

D.      Equifax's Description of Its Reinvestigation, 15 U.S.C. § 1681i(a)(7)

This Court also holds that Equifax cannot be held liable for negligent non-compliance with 15 U.S.C. § 1681i(a)(7), which requires that a CRA provide consumers with its reinvestigation procedures upon request.  Plaintiff claims that had Equifax fully disclosed its reinvestigation process, he would have contacted his creditors directly to resolve his disputes.  However, in his cross-motion for summary judgment and in the corresponding exhibits, Plaintiff states that he *did* contact his creditors directly about the disputed portions of his accounts.  *See, e.g.*, Pl.'s Ex. at 203, 219.  Given that this Court has previously ruled that the evidence shows that the entries on the First

USA, Fleet, Universal Bank, and University of Maryland accounts were not inaccurate, the failure of Defendant to provide Plaintiff with details about its reinvestigation certainly did not serve as the "but for cause to all damages" suffered by Plaintiff.   Because Plaintiff cannot demonstrate that Equifax's failure to disclose its reinvestigation caused him to sustain actual injuries, this Court concludes that Plaintiff cannot prevail in his suit for negligent non-compliance with 15 U.S.C. § 1681i(a)(7).

      E.      <u>Equifax's Alleged Failure to Indicate Plaintiff's Account as In Dispute, Pursuant to 15 U.S.C. § 1681i(c)</u>

Section 1681i(b) specifies that if a consumer remains dissatisfied with the results of a CRA's investigation, he may file a dispute to be attached to his credit report.  *See* 15 U.S.C. § 1681i(b). Section 1681i(c) requires that the CRA clearly note that the consumer disputes that item in subsequent consumer reporting. 15 U.S.C. § 1681i(c).

This Court remains unpersuaded that any alleged failure to comply with 15 U.S.C. § 1681i(c) resulted in harm to Plaintiff.  According to Plaintiff, his injury flows from the fact that "[a]s a matter of general practice, disputed accounts are not used to compute FICO credit scores."  As a result, Plaintiff reasons that his FICO score would have been higher had Equifax marked his accounts as disputed.  Yet, no facts in the record substantiate this conclusory statement.  In particular, Plaintiff has not included an affidavit from any person in the credit industry that details how FICO scores are computed and whether, as an industry practice, disputed items are omitted when calculating a FICO score.  On a motion for summary judgment, unsworn and unauthenticated conclusory statements prove insufficient to create a genuine issue of material fact.  *See Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir. 1990).  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for damages for negligent violations of 15 U.S.C. § 1681i(c) because Plaintiff has

not presented any evidence of actual damages.

      F.      <u>Equifax's Alleged Failure to Provide Updated Credit Reports to Prospective Creditors, 15 U.S.C. § 1681i(d)</u>

Finally, Plaintiff asserts that Equifax did not send out updated credit reports to his creditors, as required by 15 U.S.C. § 1681i(d). Plaintiff, however, has not directed this Court to any evidence that would provide a basis for this assertion.  Due to the lack of any evidence in the record that Defendant failed to provide updated reports to Plaintiff's creditors, Plaintiff has not shown a genuine issue of material fact exists concerning Defendant's compliance with 15 U.S.C. § 1681i(d).

      G.      <u>Maintenance of a Fair and Impartial Role, 15 U.S.C. § 1681(a)(4)</u>

Relying on § 1681(a)(4) of the FCRA entitled "Congressional Findings and Statement of Purpose," Plaintiff alleges that Equifax's conduct does not comport with the FCRA's requirement of impartiality.          In its entirety, this section of the FCRA states, "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."15 U.S.C. § 1681(a)(4).  While this sentence certainly articulates one of the purposes behind Congress's passage of the FCRA, this language is merely precatory.  As this section of the FCRA does not create an enforceable obligation on the part of CRAs, Plaintiff cannot found a claim on this provision of the FCRA.

      H.      <u>Willful Non-Compliance with the FCRA</u>

Having analyzed Plaintiff's claims under each substantive section of the FCRA, this Court finds that Plaintiff cannot establish a willful violation of the statute's provisions.  A suit for willful non-compliance with the FCRA differs from one for negligent non-compliance in that actual damages are not a statutory prerequisite to an award of punitive damages for a willful violation of the Act.  *Yohay v. City of Alexandria Employees Credit Union, Inc*., 827 F.2d 967, 972 (4th

Cir.1987).  To prove willfulness, a plaintiff must "show that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of the consumer." *Dalton,* 257 F.3d at 418; *see also Ausherman v. Bank of America Corp.,* 352 F.3d 896, 900 (4th Cir. 2003).

In Section I of this Opinion, this Court held that Plaintiff has not demonstrated that an issue of material fact exists as to whether Equifax's actions offended the requirements of § 1681e(b) because his credit report was "accurate" within the meaning of the provision and that, in any event, Equifax had adopted reasonable procedures.  In the absence of a violation of § 1681e(b), it follows that Plaintiff cannot show a willful violation of the provision.

Similarly, this Court holds that the record does not contain sufficient evidence to demonstrate Equifax's reinvestigation procedures willfully violated § 1681i, albeit for different reasons. Plaintiff claims that the qualifications of Equifax's staff and the company's escalation procedures exhibit its reckless conduct.   Plaintiff, however, has not proffered any evidence that would tend to show that Equifax *knowingly* or *intentionally* acted with conscious disregard for his rights by the manner in which it conducted its reinvestigation of his disputes.   Equifax contacted each of Plaintiff's creditors to resolve his complaints, and after its reinvestigation, made several of the changes that Plaintiff requested.  The fact that many of the dispute agents have not attended a four-year college does not render them *per se* incapable of handling moderate or complex disputes. Furthermore, the FCRA does not mandate that CRAs implement "escalation" procedures, and Plaintiff does not and cannot show how such procedures would have altered Equifax's reinvestigation of his claim.  He merely concludes that had Equifax had an attorney reviewing his claim, the company would have acceded to his requests.  Yet, as this Court has previously observed, Equifax had reason to believe that the disputed accounts were correctly reported.   As such, any

flaws with Equifax's reinvestigation procedures do not rise to the level of a willful violation of the FCRA.

Nor does Equifax's handling of Plaintiff's Talk America application demonstrate a reckless disregard for Plaintiff's rights.   On August 24, 2004, Plaintiff applied for Talk America long distance service.   When Talk America sought to obtain Plaintiff's credit report from Equifax in connection with this application,  Equifax returned a zero or no score report for Plaintiff.  In a letter to Plaintiff, a representative of Talk America offered the following account to explain the zero score:

> The reason for denying the application submitted on August 24, 2004 was due to the fact that Equifax returned a "zero score/no score."  It appears that the name *submitted to* Equifax was spelled "Guinquina Wu" which is clearly a misspelling of your name.  We believe that *our* submission of a name different from the actual name associated with your social security number in Equifax's databases (Jianqing Wu) resulted in Equifax returning the zero/no score response.
>
> . . .
>
> Due to communications errors that occasionally occur between Talk America and Equifax, it is probable that Talk America was not able to access your credit report at the time of your call on September 26, 2004.

Pl. Ex. at 273 (emphasis added).  Thus, although all parties agree that the zero score was erroneous, Equifax produced this score for Plaintiff because Talk America, not Equifax, incorrectly spelled Plaintiff's name.

This Court has addressed the substance of many of Plaintiff's other arguments that Equifax willfully violated the FCRA in earlier portions of the Opinion.  The remaining arguments simply lack  factual support.  For example, Plaintiff claims that "Equifax helped creditors engage in the grossly unfair practice of arbitrarily and inaccurately reducing high credit limits."  A compilation of inferences cannot create an issue of material fact, and without any evidence to show this type of collusion, these statements cannot survive a motion for summary judgment.

In sum, Plaintiff has not introduced evidence into the record that would suggest that Equifax acted with conscious disregard for his rights under the FCRA. Therefore, for this reason and those discussed more fully in the preceding sections of this Opinion, this Court grants summary judgment in favor of Equifax on Plaintiff's FCRA claims.

II.     **Plaintiff's State Law Claims**

This Court will also grant summary judgment on Plaintiff's state law claims for libel, nuisance, and civil conspiracy. As Defendant correctly notes, the FCRA preempts state law causes of action for defamation invasion of privacy, or negligence with respect to a CRA's reporting of consumer credit information except when the CRA acted with malice or willful intent. Section 1681h(e), the FCRA's preemption provision, provides that:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). Invoking this provision, Defendant contends that the FCRA preempts all of Plaintiff's claims since Plaintiff cannot prove that Equifax acted with malice or willful intent to injure Plaintiff.

A.      Libel

An action for libel may fall squarely within the FCRA's preemption provision, as libel is a form of defamation. *See* Black's Law Dictionary (8th ed. 2004) (defining libel as a "defamatory statement expressed in a fixed medium, esp. writing but also a picture, sign, or electronic broadcast"); *see also Grant*, 789 F. Supp. at 693 (holding that a plaintiff's common law claim for defamation was preempted by § 1681h(e) of the FCRA).

As previously discussed, Plaintiff has not demonstrated that Defendant committed the alleged acts with malice or reckless disregard for his rights.  Consequently, the FCRA preempts Plaintiff's libel action.

B.      Nuisance

Unlike defamation, § 1681h(e) does not list nuisance as a one of the causes of action subject to the FCRA's preemptive effect.  In this case, the interpretative canon *expressio unius est exclusio alterius* appears applicable.  This canon of statutory construction instructs that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)).  That the statute does not reference nuisance while it explicitly names defamation, invasion of privacy, or negligence counsels against finding preemption.  *See, e.g.*, *Andrews*, 534 U.S. 19, 28 (applying canon of *expressio unius est exclusio alterius* to § 1681p of the FCRA).

Even though the FCRA does not preempt Plaintiff's action for nuisance, Plaintiff has not stated a claim for public nuisance.  Under Maryland law, the tort of public nuisance seeks to remedy acts that obstruct the exercise of a public right.  *See, e.g.*, *Miller v. Maloney Concrete Co.*, 491 A.2d

1218, 1225 (Md. Ct. Spec. App. 1985); *Little v. Union Trust Co.*, 412 A.2d 1251,1254 (Md. Ct. Spec. App. 1980) (stating "No better definition of a public nuisance has been suggested than that of an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects.'  The term comprehends a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort or convenience of the general public.") (quoting Prosser, Law of Torts 583 (4th ed. 1971)).

Plaintiff has not identified the public or common right upon which Defendant has allegedly infringed.  Nor has this Court found a single case that holds that an alleged violation of a federal statute can constitute a public nuisance under Maryland law.  Where, as here, Plaintiff seeks to enforce a right created by Congress, this Court declines to expand Maryland nuisance law beyond the bounds of precedent.

C.      Civil Conspiracy

Because this Court has dismissed all of Plaintiff's FCRA and his libel and public nuisance claims, Plaintiff's action for civil conspiracy will not lie.  Maryland law defines a civil conspiracy as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005) (quoting *Green v. Wash. Sub. San. Comm'n,* 269 A.2d 815, 824 (Md. 1970)).  A plaintiff, however, cannot recover damages "in the absence of other tortious injury" *Id.*; *see also Mackey v. Compass Marketing, Inc*., 892 A.2d 479,485 (Md. 2006).  As no issues of material fact are in dispute that would prove that Defendant engaged in independent

tortious conduct, Plaintiff's claim for civil conspiracy cannot withstand Defendant's Motion for Summary Judgment.

## **<u>CONCLUSION</u>**

Thus, based on the foregoing analysis, this Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.   An Order consistent with this Opinion will follow.

Date:   <u>May 2, 2006</u>                                    _____/s/_____
                                                                     Alexander Williams, Jr.
                                                                     United States District Judge